UNITED-BILT HOMES, INC. v. DONALD L. TEAGUE ET UX

5-4318                                              432 S.W. 2d 1

Opinion Delivered September 16, 1968

[Rehearing denied October 28, 1968.]

*James R. Hale, John L. Wilson* and *S. Hubert Mayes, Jr.* for appellant.

*Walter R. Niblock* and *William R. Hass* for appellees.

GEORGE ROSE SMITH, Justice.    This is a usury case. On November 9, 1962, United-Bilt Homes, Inc., agreed to build and to finance a house for the plaintiffs, Teague and his wife.    The basic cash price, after a $10 down payment, was $2,450, but that figure was not set forth in the building contract or in the note or in the mortgage, all executed on November 9.    Instead, all three instruments simply recited the Teagues' obligation to make 90 monthly payments of $43.07 each, or a total of $3,876.30.

On October 5, 1965, the Teagues, after having made several payments at irregular intervals, brought this suit to cancel the debt for usury.    United-Bilt denied usury and sought foreclosure of its mortgage.    This appeal is from a decree canceling the note and mortgage, for usury.

The Teagues' indebtedness was initially $2,450. They signed documents ostensibly requiring them to pay more than 10% per annum on that debt.    In the loan papers United-Bilt made no effort whatever to explain its finance charges.    That omission brings the case within the rule that we adopted more than ten years ago in taking our stand on the matter of truth in lending. We then pointed out that when the lender writes the contract he has the opportunity to put down in black and white an intelligible description, and the exact amount, of every charge that is being added to the principal of the debt.    When, as here, the lender gives the borrower no information at all about the deferred charges, the trier of the facts is justified in assuming, until he is convinced by proof to the contrary, that the difference between the principal of the loan and the face amount of the contract represents interest on the debt. *Jones* v. *Jones*, 227 Ark. 836, 301 S.W. 2d 737 (1957).    We have consistently adhered to the rule laid down in the *Jones* case, which is an important but completely fair weapon in the legal arsenal available to the courts in the continuing fight against usury.

134

In the case at bar the charges were excessive on their face. United-Bilt fixed the monthly payments at $43.07. That figure exceeds the maximum legal charge of $38.80—the amount needed monthly to retire a debt of $2,450 in 90 months at 10% interest. See Lake's Monthly Installment and Interest Tables (5th Ed., 1959), p. 149. Under the *Jones* case United-Bilt had the burden of explaining the excessive charges.

At the trial United-Bilt supplied an exact explanation of its monthly charge of $43.07. Dennis Wilson, its chief accountant, testified that United-Bilt's experience had shown that its closing costs always exceeded 11% of the principal debt. Hence the table which it furnishes to its salesmen was prepared by adding 11% to the principal and then charging 10% interest upon that total.

Lake's tables confirm Wilson's testimony. Here the principal was $2,450. Eleven percent of that amount is $269.50, making a total of $2,719.50. According to Lake, p. 149, a loan of $2,719.50, payable in 90 monthly installments at 10% interest calls for monthly payments of $43.07. That, to the very penny, was the amount specified in this case.

Thus United-Bilt's task is that of proving legitimate closing costs—costs that may be passed on to the borrowers at 10% interest for the life of the loan—of at least $269.50. United-Bilt now contends that it was entitled to charge the following closing costs to the Teagues, even though they were not told about any of the amounts involved:

| | |
|---|---|
| Title insurance | $ 40.00 |
| Fire and extended coverage (FEC) | 144.25 |
| Appraisal | 52.50 |
| Credit life insurance premiums | 117.27 |
| | $354.02 |

The chancellor correctly allowed the first two items, totaling $184.25, upon proof that United-Bilt had spent that amount for title and FEC insurance. The case turns upon the other two items.

United-Bilt attempts to sustain the appraisal charge by insisting that it was for the Teagues' benefit. That just is not true. The inspection and appraisal were not made until April 2, 1963, long after the consummation of the loan and the completion of the house. The Teagues were not even told about the appraisal, which did not benefit them in any way whatever. The appraisal, fee was for United-Bilt's sole benefit and cannot be passed on to the Teagues. *Winston* v. *Personal Finance Co.*, 220 Ark. 580, 249 S.W. 2d 315 (1952).

There remains the premium for credit life insurance. In an earlier United-Bilt case we disallowed that premium because it was not actually paid in advance. *United-Bilt Homes* v. *Knapp*, 239 Ark. 940, 396 S.W. 2d 40 (1965). United-Bilt now seeks to distinguish that case by insisting that here its proof shows that the credit life premium *would* have been paid eventually, so that it was entitled to take the premium into account as part of the closing costs.

There are two unanswerable objections to that argument. First, even though United-Bilt intended in good faith to pay the credit life premium, its own undisputed proof shows that the premium was not an *interest-bearing* charge susceptible of being included in the closing costs. Wilson, United-Bilt's own accountant, testified that the premium was not paid to the credit life insurance company in advance. Instead, had the Teagues paid their monthly installments as they came due, the monthly credit life premium would have been taken out of each payment, so that United-Bilt would never have been in the position of having advanced any of the premium as a loan to the Teagues. Hence, just as in the *Knapp* case, United-Bilt is not entitled in the case at hand to charge interest upon a sum of money that was

not meant to be lent to the Teagues. Of course the issue of usury is to be determined as of the date of the contract and not by subsequent events. *General Contract Corp.* v. *Duke,* 223 Ark. 938, 270 S.W. 2d 918 (1954).

Secondly, United-Bilt was not contractually bound to carry one penny's worth of credit life insurance. The only reference to such insurance was contained in the printed building contract, prepared by United-Bilt and to be construed in the borrowers' favor: "Owner agrees to pay all attorney's fees, installment loan expenses (including cost of credit life insurance), title and property insurance, and recording costs, incurred and to be incurred in connection with creating and fixing the first lien and mortgage . . . and in financing the time sale hereby contemplated."

It will be seen that the Teagues agreed to repay the cost of credit life insurance, but there was no requirement whatever that United-Bilt carry such insurance. The matter was discussed during the negotiations for the loan, but the written contract expressly provided that it contained all items and conditions agreed upon by the parties. Hence the Teagues had no legally enforceable right to compel United-Bilt to carry credit life insurance. United-Bilt might therefore have dropped the coverage at any time—a fact which obviously precludes it from now contending that the contemplated premium was an interest-bearing charge subject to inclusion in the closing costs. (As a matter of fact, the coverage that was actually obtained would not have benefited the Teagues if Donald Teague had died at any time within fifteen months before the date of trial. That is so because the policy provided that the insurance would not be payable if the monthly payments to United-Bilt were in arrears by more than 90 days at the death of the insured. The Teagues' payments were more than 90 days in arrears for fifteen months before the trial; so they had no protection.)

During our discussion of the case the suggestion was made that credit life premiums should be treated in the same way as unaccrued interest; that is, in a suit to collect an accelerated debt unaccrued and unpaid credit life premiums should not be considered in the determination of the issue of usury. The analogy is fallacious. Unaccrued *legal* interest can be disregardeed, as in *Mid-State Homes* v. *Knight,* 237 Ark. 802, 376 S.W. 2d 556 (1964), because the contract would not have been usurious if the debtors had made all payments as they came due. But when the interest rate was originally usurious, the lender cannot validate the contract by bringing suit for legal interest only. *Brooks* v. *Burgess,* 228 Ark. 150, 306 S.W. 2d 104 (1957).

Similarly, if United-Bilt had been contractually bound to make the credit life premium payments every month, the future unpaid monthly premiums would not have made usurious an agreement that was originally legal. But here the matter of paying the monthly premiums lay entirely within United-Bilt's uncontrolled discretion. It might have dropped such insurance at any time and still have continued to collect the premiums as a part of the Teagues' monthly payments. Such a contingency, lying wholly within the lender's power, opens the door to usury. *Sosebee* v. *Boswell,* 242 Ark. 396, 414 S.W. 2d 380 (1967). There would evidently be no ceiling upon the permissible interest rate if lenders were allowed to include in their finance charges items that they were free to pay or not to pay as they later saw fit.

We have not overlooked the fact that the Teagues' first monthly payment was not due until January 6, 1963, giving them the benefit of a 58-day interval instead of the usual 30-day interval in the computation of interest. Even so, that windfall of $20.50 in interest (Lake, supra) is far short of offsetting the excessive interest charges.

Affirmed.

BROWN, J., not participating.

HARRIS, C.J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice. I respectfully dissent. I do not disagree with the principles stated in the court's opinion, as much as I disagree with the application made of them. I particularly agree that the courts should be zealous in protecting borrowers and installment credit purchasers against any fraud, trick, scheme, device or shield cloaking a usurious charge for loan or forbearance of money. I do not think that the penalty provided by our constitution is too severe when lenders exact usurious charges, either by blatant disregard of our usury laws or by any scheme or evasion. The zeal of the courts in affording protection has not abrogated fundamental rules to be applied in usury cases. Some of these are:

1. Usury is a corrupt agreement for more than the legal rate of interest on a loan of money or forbearance of a debt. It is the excess over the legal rate charged for the use of money. *Universal C.I.T. Credit Corp.* v. *Hudgens,* 234 Ark. 1127, 356 S.W. 2d 658.

2. The test, when usury is alleged, is whether the borrower promised to pay a greater rate of interest than the law permits and the lender knowingly entered into a usurious contract intending to profit by the methods employed. *Commercial Credit Plan, Inc.* v. *Chandler,* 218 Ark. 966, 239 S.W. 2d 1009; *General Contract Corp.* v. *Duke,* 223 Ark. 938, 270 S.W. 2d 918; *Blalock* v. *Blalock,* 226 Ark. 75, 288 S.W. 2d 327.

3. The burden is upon one asserting usury to show that the transaction is usurious. *Wallace* v. *Hamilton,* 238 Ark. 406, 382 S.W. 2d 363; *Cox* v. *Darragh Co.,* 227 Ark. 399, 299 S.W. 2d 193.

4. Even though the courts are justified in considering the entire difference between the amount to be

paid by a purchaser in a credit transaction and the contract sale price as interest, where the difference is undesignated or unitemized, yet, usury will not be presumed, imputed or inferred when the opposite conclusion can reasonably and fairly be reached. *Universal C.I.T. Credit Corp.* v. *Hudgens,* 234 Ark. 1127, 356 S.W. 2d 658; *Brown* v. *Fretz,* 189 Ark. 411, 72 S.W. 2d 765; *Brittian* v. *McKim,* 204 Ark. 647, 164 S.W. 2d 435.

5. In determining whether a contract is usurious it must be viewed as of the time it was entered into and it must be presumed that it will be performed according to its terms. See *General Contract Corp.* v. *Duke, supra; Sloan* v. *Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W. 2d 802; *Harris* v. *Guaranty Financial Corp.,* 244 Ark. 218, 424 S.W. 2d 355; *Foster* v. *Universal C.I.T. Corp.,* 231 Ark. 230, 330 S.W. 2d 288; *Sager* v. *American Investment Co.,* 170 Ark. 568, 280 S.W. 654; *Eldred* v. *Hart,* 87 Ark. 534, 113 S.W. 213; 55 Am. Jur. 331, Usury, §12.

6. The actual test of a transaction alleged to be usurious is whether the total amount the borrower will be required to pay is greater than the total amount he could be required to pay to retire the principal indebtedness with interest at 10% per annum for the term thereof. *McDougal* v. *Hachmeister,* 184 Ark. 28, 41 S.W. 2d 1088.

7. All reasonable expenses incident to a loan which the borrower agrees to pay or which are paid out by the lender for his benefit are properly a part of the loan proceeds or the amount loaned. *Harris* v. *Guaranty Financial Corp.,* 244 Ark. 218, 424 S.W. 2d 355; *Lyttle* v. *Mathews Investment Co.,* 193 Ark. 849, 103 S.W. 2d 47; *Brown* v. *Fretz,* 189 Ark. 411, 72 S.W. 2d 765; *Sidway* v. *Harris,* 66 Ark. 387, 50 S.W. 1002; *Shattuck* v. *Byford,* 62 Ark. 431, 35 S.W. 1107.

8. Insurance premiums paid a third party are proper charges when the borrower agrees to pay them or receives the policy, is not charged an excessive prem-

ium, and receives the benefit of the insurance. *Winston v. Personal Finance Company of Pine Bluff*, 220 Ark. 580, 249 S.W. 2d 315; *Smith v. Eason*, 223 Ark. 747, 268 S.W. 2d 389; *Griffin v. Murdock Acceptance Corp.*, 227 Ark. 1018, 303 S.W. 2d 242; *Universal C.I.T. Credit Corp. v. Lackey*, 228 Ark. 101, 305 S.W. 2d 858; *Whiddon v. Universal C.I.T. Credit Corp.*, 227 Ark. 824, 301 S.W. 2d 567.

9. Credit life insurance premiums fall into the same category as other insurance premiums. *Lowrey v. General Contract Corp.*, 228 Ark. 685, 309 S.W. 2d 736; *Universal C.I.T. Credit Corp. v. Lackey, supra.*

10. The withholding of sums to meet obligations for insurance premiums with the acquiescence of the borrower does not render the transaction usurious, unless the insurance is a subterfuge. *Hartzo v. Wilson*, 205 Ark. 965, 171 S.W. 2d 956.

11. A borrower's default does not have the effect of rendering a transaction usurious, because it is within his power to avoid the consequences. *Carney v. Matthewson*, 86 Ark. 25, 109 S.W. 1024; *Mid-State Homes v. Knight*, 237 Ark. 802, 376 SW. 2d 556.

12. In calculating the amount the borrower could be required to pay, the statutory system of applying payments first to interest and the excess, if any, to principal is followed. Ark. Stat. Ann. §68-606 (Repl. 1957); *Lyttle v. Mathews Investment Co.*, 193 Ark. 849, 103 S.W. 2d 47; *Hare v. General Contract Purchase Corp.*, 220 Ark. 601, 605, 249 S.W. 2d 973; *Widmer v. J. I. Case Credit Corp.*, 243 Ark. 149, 419 S.W. 2d 617; *Commercial Credit Plan, Inc. v. Chandler*, 218 Ark. 966, 239 S.W. 2d 1009.

I agree with the majority that the title insurance and the fire and extended coverage premiums are properly a part of the principal indebtedness. I also agree that the appraisal fee of $52.50 was not a proper part

of the principal debt, but not for the reason indicated in the majority opinion. The contention was made by appellant that this appraisal was necessary to fix the amount of title insurance coverage. Yet this appraisal was made four months after the issuance of the title insurance policy and two months after the premium was paid. Under the caveat in *Winston* v. *Personal Finance Co. of Pine Bluff*, 220 Ark. 580, 249 S.W. 2d 315, this item must be rejected as a part of the principal debt. If the appraisal had been necessary for the purposes of title insurance, the fee paid for it would have been proper, in my opinion. So I agree that the decision depends upon the treatment of the credit life insurance premiums.

In the building contract entered into between the parties, appellees agreed to pay all attorney's fees, installment loan expenses (including credit life insurance), title and property insurance and recording costs incurred in connection with creating and fixing a first lien and mortgage and in financing the time sale in the amount of $295.00. While appellant's chief accountant calculated that total credit life insurance premiums to be paid by appellant would amount to $117.27, if all payments were made promptly by appellees, when we deduct the amount of other insurance premiums from the stipulated amount for such expenses, i.e., $295, this left only $110.75 which could be applied to credit life insurance.

Evidence that credit life insurance on the life of Donald Teague was carried by Life Underwriters Insurance Company is undisputed. Neither appellant nor its officers, directors or employees had any connection with this company. The insurance was evidenced by a certificate furnished to appellees dated November 9, 1963 providing coverage for not more than sixty (60) months. There can be no doubt that this insurance was contemplated by the parties. Not only was it mentioned in the contract, but Donald Teague testified that this insurance was discussed at the time the contract was executed. He received the certificate and was satis-

fied. The insurance was based on an arrangement by which it covered all insured debtors of appellant at a premium rate of 75c per $1,000.00 of the total unpaid balance per month, with the premium prorated among the various debtors. Appellees had the benefit of the protection afforded by the insurance while it was in force. It is not shown that appellant has any interest in the insurance company or that it receives any rebate, deduction, commission or other form of compensation from the insurer.

I submit that any idea that the premiums were not paid in advance by appellant is clearly erroneous. The first premium payment including appellees' balance of $3,876.30 was made by appellant in December 1962. The first payment on the indebtedness was scheduled for January 1963. Thus, the monthly premium would be advanced by appellant throughout the term of the insurance. It was only in appellant's chief accountant's attempt to test the contract for usury and in determining unpaid balances that the amount of the monthly premium prorations were deducted from the installment payments scheduled or made. There is no reason why, in testing the contract for usury, these credit life insurance premiums should not be added as items of the principal indebtedness as they were paid, and interest at the highest legal rate calculated on them, at least from the date of advance[1]. When this is done, the contract is not usurious[2].

---

[1]This is certainly as favorable to the borrower as he could ask. It is possible that the proper test might require the allowance of interest on some of these items from the date of the contract. This procedure has been held to be proper when the delay is not occasioned by fault or bad faith on the part of the lender. **McDougal v. Hachmeister,** 184 Ark. 28, 41 S.W. 2d 1088, 76 ALR 1463.

---

[2]While the 58-day interval between the date of the note and the date of the first payment may not be determinative of the question whether the contract is usurious, I do not agree that this makes a difference of only $20.50 in testing the contract for usury. Assuming that this is the correct amount of interest for the 28 days in excess of the normal one-month interval, that much

There is nothing in this record to indicate that appellees were charged any excessive premium, that the insurance was a subterfuge, that appellees did not acquiesce in the payment of the credit life premiums by the method followed, that the appellant profited in any way from the payment or the method of payment, or that the contract was fraudulent or contained any trick, scheme, device, shield or cloak for the exaction of excessive interest from appellees, or the avoidance of the stiff penalties of our usury laws.

I do not agree with the statement that appellant was under no obligation to pay credit life premiums. It was just as much obligated to pay credit life premiums as it was to pay title insurance and fire and extended coverage premiums, which the majority hold to properly constitute a part of the principal debt. Its failure to pay them would only have amounted to a partial failure of consideration but would not render the contract usurious. Appellant could only recover the sums actually advanced with interest from the date of advance. *Lanier* v. *Union Mortgage Banking & Trust Co.*, 64 Ark. 39, 40 S.W. 466; *Widmer* v. *J. I. Case Credit Corp.*, 243 Ark. 149, 419 S.W. 2d 617. See, also, *Mid-State Homes* v. *Knight*, 237 Ark. 802, 376 S.W. 2d 556. The fact that the insurance would not be payable if the monthly payments were in arrears for more than 90 days at the death of the insured does not alter the situation at all. This eventuality was a matter within the control of appellees, not the appellant. As hereinabove pointed out, the consequences of a borrower's default cannot make a transaction usurious.

I would reverse the decree of the trial court and remand the cause for further proceedings.

I am authorized to state that HARRIS, C. J., joins in this dissent.

more of the first payment would be applied to interest rather than to principal. Thus, after the first 58 days the principal balance on which interest would be calculated for each month would be increased by $20.50. For the full term of the loan at 10% interest, the difference would be $35.70.